**Vivian VOLK, Plaintiff,**

v.

**Gregory COLER, et al., Defendants.**

**No. 81–3366.**

United States District Court,
C.D. Illinois,
Springfield Division.

July 8, 1986.

gaged in a continuing "series of discriminatory     acts.")

Patricia C. Benassi, Peoria, Ill., for plaintiff.

Barbara J. Collins, Christina M. Saunderson, Asst. Attys. Gen., Springfield, Ill., for defendants.

## OPINION AND ORDER

MILLS, District Judge:

Bench trial.

Sexual harassment, retaliation, and sexual discrimination.

All under Title VII.

This matter is before the Court for a decision on the merits following a trial by bench held simultaneously with a jury trial.

Vivian Volk, formerly a caseworker for the Department of Children and Family Services (DCFS), filed this action against six supervisory officials within the department, charging that each violated rights guaranteed to her by the First and Fourteenth Amendments to the United States Constitution. As to these Defendants individually, Ms. Volk sued under 42 U.S.C. § 1983 and § 1985 (conspiracy to deprive a person of the equal protection of the laws). She also sued the DCFS itself under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, alleging employment discrimination and retaliation. This opinion resolves the merits of Plaintiff's Title VII case only, the other issues being resolved pursuant to jury trial and this Court's order on Defendants' motion for a directed verdict. Thus, the Court having heard the evidence presented during this eight-day trial, having determined the credibility of the witnesses, and being fully advised, hereby enters the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

### Introduction

Vivian Volk is an adult, white female who, prior to the incidents giving rise to this lawsuit, was employed by Covenant Counseling Services as a child abuse outreach worker. Covenant Counseling Services was housed in the Ottawa field office of the DCFS pursuant to a contract between the two agencies.

Defendant James Tapen was the supervisor of the Ottawa field office and allegedly sexually harassed Plaintiff. He was in charge of hiring someone for the position of Social Worker I with DCFS. Mr. Tapen allegedly made verbal threats to Ms. Volk and turned her down twice for the position and also had her prematurely transferred from the Ottawa field office to the Princeton office of the DCFS. Defendant Martin Lohman was Tapen's immediate supervisor. Defendant Jessie Hairston was the regional administrator of the Peoria region and supervised both Tapen and Lohman until March 17, 1980, when she became ill. Defendant Tom Ward took over her duties in her absence until she returned in May. After Hairston's return, she and Ward shared the duties of regional administrator until Hairston resigned in August or September. Defendant Jesse Viers was the labor relations specialist in the Peoria region assigned to handle Plaintiff's grievances. Defendant Gregory Coler was the Director of the DCFS.

### I. *Sexual Harassment*

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1) states that: "It shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's ... sex ..." The language "terms, conditions, or privileges of employment" is "an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination." *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1971) (Goldberg, J., concurring), *cert. denied*, 406 U.S. 957, 92 S.Ct. 1058, 32 L.Ed.2d 343 (1972).

In accordance with the "expansive concept" of Title VII's prescriptions, this cir-

cuit has held that the Act prohibits an employer from imposing sexual consideration as a condition of employment, *Horn v. Duke Homes, Div. of Windsor Mobile Homes,* 755 F.2d 599 (7th Cir.1985), and the Supreme Court has recently held that sexual harassment is a form of employment discrimination prohibited by Title VII. *Meritor Savings Bank, FSB v. Vinson,* —— U.S. ——, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Although other doctrinal vehicles can sometimes be used to remedy the sexual harassment of an employee, *see e.g., Moffett v. Gene B. Glick Co., Inc.,* 621 F.Supp. 244, 283–86 (N.D.Ind.1985) (unlawful harassment may constitute state law torts such as intentional infliction of emotional distress, wrongful discharge or invasion of privacy); *Horn v. Duke Homes, Div. of Windsor Mobile Homes, supra,* 755 F.2d at 603 n. 3, sexual harassment "constitutes precisely the kind of 'artificial, arbitrary, and unnecessary barrier to employment,' that Title VII was intended to prevent." *Id.* at 603 (*quoting Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971)). As stated by the high Court in *Vinson:*

> Since the [EEOC] guidelines were issued, courts have uniformly held, and we agree, that a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment. As the Court of Appeals for the Eleventh Circuit wrote in *Henson v. Dundee,* 682 F.2d 897, 902 (1982):

> "Sexual harassment which creates a hostile or offensive environment for members of one sex is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality. Surely, a requirement that a man or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest of racial epithets."

*Vinson,* —— U.S. at ——, 106 S.Ct. at 2405–06.

A harassment claim does not neatly fit the usual method of analysis in Title VII cases founded on class-based discrimination as set forth in *McDonnell-Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 403 (1983). These cases, recognizing the difficulty of obtaining direct evidence of an employer's intent to discriminate, permit a plaintiff to indirectly prove unlawful employer motivation by allowing him to make out a *prima facie* case of discrimination through the introduction of a minimal level of evidence which justifies an *initial* inference that an employer's personnel decision was based on discriminary motivation. The *McDonnell-Douglas* analysis then imposes upon the employer a burden of production: to articulate a valid, non-discriminatory reason for the employment action. *See Johnson v. University of Wisconsin-Milwaukee,* 783 F.2d 59, 63 (7th Cir.1986).

This analysis, however, appears inappropriate in a harassment case, because once a plaintiff establishes that she was harassed and that the employer was involved via *respondeat superior,* it is difficult to imagine how the employer could articulate a legitimate reason for the harassment. *See Moffett v. Gene B. Glick Co., Inc.,* 621 F.Supp. 244, 266 (N.D.Ind.1985). Thus, courts ruling on Title VII harassment claims have developed a set of elements which, if proven, constitute a Title VII violation for sexual harassment:

(1) the employee belongs to a protected group;

(2) the employee was subject to unwelcome harassment;

(3) the harassment complained of was based on sex (or race);

(4) the harassment complained of affected a term, condition, or privilege of employment;

(5) respondeat superior, that is, that the employer knew or should have known of

the harassment and failed to take prompt remedial action;[1] and

(6) the employee acted reasonably under the circumstances.

*Henson v. City of Dundee,* 682 F.2d 897, 909 (11th Cir.1982) (elements 1–5); *DeGrace v. Rumsfeld,* 614 F.2d 796 (1st Cir. 1980) (element 6). *Accord Moffett v. Gene B. Glick Co., Inc.,* 621 F.Supp. at 266. Because we believe these elements properly adapt the *McDonnell-Douglas* analysis to the context of sexual harassment and are consistent with both the precedent of this circuit and that of the Supreme Court, the Court has considered Ms. Volk's harassment claim in light of these elements. As with any Title VII case, the ultimate burden of persuasion rests with Plaintiff. *Coates v. Johnson & Johnson,* 756 F.2d 524, 531 (7th Cir.1985). We find that Plaintiff has failed to meet her burden of proving the fourth element: that Ms. Volk was in fact subject to harassment that was so pervasive as to affect a term, condition or privilege of employment.

### (A) *Sexual Harassment Defined*

In order to show that harassment affected the "terms, conditions, or privileges" of employment, a plaintiff need not show that the harassment or refusal to accede to sexual demands caused distinct employment consequences such as discharge or transfer. *Vinson,* — U.S. at —, 106 S.Ct. at 2404. He must, however, establish that the harassment was sufficiently persuasive so as to create a hostile or discriminatory work environment, *see Gilbert v. City of Little Rock,* 722 F.2d 1390, 1394 (8th Cir. 1983), *cert. denied,* 466 U.S. 972, 104 S.Ct. 2347, 80 L.Ed.2d 820 (1984); *Katz v. Dole,* 709 F.2d 251 (4th Cir.1983); *Henson,* 602 F.2d at 901–02; *Bundy v. Jackson,* 641 F.2d 934, 944–46 (D.C.Cir.1981), or other adverse employment consequences. *Horn v. Duke Homes,* 755 F.2d at 603–04. As stated by Justice Goldberg in *Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir.1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 1058, 32 L.Ed.2d 343 (1972):

> ... I do not wish to be interpreted as holding that an employer's mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee falls within the proscription of section 703 ...

A Title VII violation requires that the harassment be "sufficiently severe or pervasive to alter the conditions of (the victim's) employment and create an abusive working environment." *Vinson,* — U.S. at —, 106 S.Ct. at 2406 (*quoting Henson,* 682 F.2d at 904).

In determining what constitutes "sufficiently pervasive" harassment, the courts have held that acts of harassment cannot be isolated or sporadic, *Katz v. Dole,* 709 F.2d at 256; *Taylor v. Jones,* 653 F.2d 1193, 1199 (8th Cir.1981); *Bundy v. Jackson,* 641 F.2d at 943 n.9, nor merely part of a casual conversation. *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1257 (8th Cir. 1981); *Cariddi v. Kansas City Chiefs Football Club, Inc.,* 568 F.2d 87, 88 (8th Cir.1977). Instead, a Title VII violation requires the plaintiff to show a " 'concerted pattern of harassment' ... such as a 'steady barrage of approbrious racial comment,' ... which is 'so excessive and approbrious' " that it disrupts the normal work environment. *Moffett v. Gene B. Glick Co.,* 621 F.Supp. at 270 (citations omitted).

Examination of these and other authorities leads this Court to the conclusion that a Title VII violation for sexual harassment requires more than occasional foul language or gestures directed toward an em-

---

1. In *Horn v. Duke Homes, Division of Windsor Mobile Homes, Inc.,* 755 F.2d 599, 604 (7th Cir. 1985), this circuit adopted a rule of strict liability, holding an employer strictly liable for the acts of sexual harassment committed by their supervisory employees "regardless of whether the specific acts complained of were authorized or even forbidden by the employer and regardless of whether the employer knew or should have known of their occurrence ..."

While declining "the parties' invitation to issue a definitive rule on employer liability," the Supreme Court in *Vinson* held that the Court of Appeals erred in concluding that employers "are always automatically liable for sexual harassment by their supervisors." — U.S. at —, 106 S.Ct. at 2408. Instead, the Court held that lower courts should look to common law principles of agency in determining the scope of an employer's liability. *Id.*

ployee. Unfortunately, human nature being what it is, this kind of conduct will, on occasion, occur. While such conduct is certainly to be discouraged, every instance of bad judgment on the part of a supervisor does not constitute a Title VII violation.

Nonetheless, when the conduct reaches the point to where an employee is continually subjected to demeaning and offensive language before his colleagues by a supervisor, "such activity necessarily has the effect of altering the conditions of his employment within the meaning of Title VII ... Continuous abusive language, whether racist, sexist, or religious in form, can often pollute a healthy working environment by making an employee feel uncomfortable or unwanted in his surroundings. In more extreme cases, ... it can even severely affect the employee's emotional and psychological stability." *Weiss v. United States*, 595 F.Supp. 1050, 1056 (E.D.Va.1984) (citation omitted). The Court thus turns the question of whether such pervasive harassment occurred in the case *sub judice.*

### (B) *Evidence of Harassment*

■ The evidence in this case does not establish, by a preponderance, that Plaintiff was in fact subject to a continuous pattern of harassment. Clearly, Ms. Volk herself testified that her immediate supervisor, Defendant James Tapen, made unwelcome sexual advances toward her and referred to her in such condescending terms as "honey", "babe", and "tiger." Ms. Volk also testified that Mr. Tapen often referred to her and other women in the office as "frustrated females" or "bitches," and that Tapen often made certain obscene gestures toward her.

Tapen, however, denies that he harassed Ms. Volk or other women in the office. His testimony is supported by ten other witnesses, all employees and supervisors within the DCFS, each of whom testified that

they never saw Tapen engage in the conduct alleged by Ms. Volk.[2] Further, each testified that Ms. Volk never registered any complaints to her supervisors or otherwise protested the alleged conduct until after she was turned down for the social worker position. While each described to varying degrees what can be termed a "loosely run office," none felt that the language or conduct of any supervisors amounted to harassment.

An example is the testimony of Ms. Kanthak, an employee at the Ottawa field office who worked with both Defendant Tapen and Ms. Volk. Ms. Kanthak testified that although foul language in the office was an ordinary occurrence, it was the employees as well as Tapen who used such language. She also testified that Tapen was a "hands on" person, but that his conduct was never offensive, and that he treated every employee in the office the same. Ms. Kanthak's testimony is consistent with that of the great majority of the other employees. For instance, Wally Kuhn, who has worked for DCFS for six years and who shared an office with Ms. Volk, testified that while Tapen would sometimes put his arm around a person's shoulder, he never harassed anyone and his conduct was not offensive. Two other caseworkers, Ms. Valerie Beguinn and Ms. Peggy Sluck, testified similarly.

By contrast, three witnesses (other than Ms. Volk) testified that Tapen sexually harassed Ms. Volk. The first, Ms. Mary Wegrzyn, is Ms. Volk's long-time friend and roommate who, like Ms. Volk, has filed a number of grievances as well as a lawsuit protesting what she feels are unfair employment practices. The Court has considered the credibility of Ms. Wegrzyn's testimony in light of these facts, and taking into account her possible bias, finds that her testimony as to a pervasive pat-

---

**2.** The following witnesses testified that they themselves never saw any acts of harassment, nor were complaints made to them concerning possible harassment: Jesse Viers, Martin Lohnman, Thomas Ward, Gregory Coler, Rosemary Irving (contract administrator for the DCFS Peoria region), Joan Kelly (Princeton office supervisor), Ginger Kanthak (DCFS employee), Wally Kuhn (same), Ms. Valerie Begrinn (same) at the Ottawa office, and Ms. Peggy Slack (same).

tern of offensive conduct on the part of Tapen is somewhat suspect.

Two other witnesses, Ms. Kathy Thone and Ms. Alice Fitzgerald, also testified that Mr. Tapen used sexually condescending language towards Ms. Volk and other women in the office, and that he made obscene gestures towards them. The Court notes that upon cross-examination, Ms. Fitzgerald admitted to being passed over for a promotion three times. Without, however, explicitly rejecting the entire testimony of these two witnesses, the Court finds that the occasional use of offensive language or gestures testified to by these witnesses (as well as Ms. Volk and Ms. Wegrzyn) does not meet Plaintiff's burden of establishing a "concerted pattern of continuous harassment."

What emerges from the evidence as a whole is a picture of an office in which occasional offensive language and sometimes unprofessional conduct are tolerated. This kind of "occasional" misconduct, however, does not constitute a Title VII violation. It is unfortunate that many working environments are in fact "polluted" by continuous patterns of harassment and use of offensive language. *See e.g.*, Bralove, *A Cold Shoulder: Career Women Decry Sexual Harassment by Bosses and Clients*, Wall Street Journal, Jan. 29, 1976, p. 1, col. 1 (citing an informal survey of 155 employed women, by Working Women United, showing that 70% had encountered sexual harassment of some sort in their working environment). At the same time, however, the charge of sexual harassment is an extremely serious one, and more than an occasional impropriety is required to satisfy the legal standard under Title VII.

In this case, the Court cannot find that Plaintiff has met her burden of showing a pervasive pattern of harassment. As previously noted, we cannot fully accept the testimony of the four witnesses who testified to sexual harassment. The Court more fully credits the testimony of the eleven witnesses who denied knowledge of pervasive harassment—and, most significantly—who testified that no complaints of

sexual harassment were ever made to DCFS authorities.

In accordance with the foregoing, the Court finds in favor of the Defendant DCFS and against the Plaintiff on her harassment charge.

## II. *Retaliation*

Section 704(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3(a), provides that:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, *because he has opposed any practice made an unlawful employment practice by this subchapter,* or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

(Emphasis added.)

Under § 704(a), it is a civil rights violation to fire (or refuse to hire, transfer, etc.) an employee because he opposed discrimination against him or a fellow employee, even if he was mistaken and there was no discrimination. *Berg v. LaCrosse Cooler Co.*, 612 F.2d 1041 (7th Cir.1980). The mistake, however, must be a sincere one, for as explained by the Court in *Rucker v. Higher Educational Aids Board*, 669 F.2d 1179, 1182 (7th Cir.1982):

it seems unlikely that the framers of Title VII would have wanted to encourage the filing of utterly baseless charges by preventing employers from disciplining the employees who made them. But it is good faith and reasonableness, not the fact of discrimination, that is the critical inquiry in a retaliation case.

Further, this circuit has held that "employees may not engage in conduct which is excessively disloyal or hostile or disruptive

and damaging to the employer's business and then claim the shield of § 704(a) as protection against adverse action." *Mozee v. Jeffboat, Inc.,* 746 F.2d 365, 374 (7th Cir.1984). Although the Court finds that Plaintiff was not discriminated against or harassed within the meaning of Title VII, we do not believe the evidence shows that Ms. Volk was acting in bad faith in filing her EEOC charges and in opposing what she felt was discrimination. Thus, the fact that Plaintiff did not prevail on her discrimination and harassment charges does not necessarily preclude a victory on the retaliation charges.

In the Seventh Circuit, proof of unlawful retaliation requires the plaintiff to show that the employer would not have taken the adverse action "but for" the plaintiff's opposition. *McCluney v. Jos. Schlitz Brewing Co.,* 728 F.2d 924, 928 (7th Cir.1984). Thus, Ms. Volk must show that *but for* her opposition to an unprotected activity she would not have been turned down for the social worker position or transferred. There are two methods of proving such illegal retaliation: "either *directly* by persuading the court that a discriminatory reason more likely motivated the employer or *indirectly* by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 928 (*quoting Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).) Because direct proof of an employer's motivation is difficult to come by, most cases require application of the *McDonnell Douglas/Burdine* indirect method of proof, which has been uniformly applied to retaliation cases. See *Klein v. Trustees of Indiana University,* 766 F.2d 275, 280 (7th Cir.1985).

As adapted to the retaliation setting, § 704 requires that the plaintiff show: (1) he opposed an employment practice that he reasonably believed was unlawful within the meaning of Title VII or he participated in a proceeding under Title VII; (2) he suffered an adverse action by his employer; and (3) a causal link between the opposition and the adverse employment action. *Klein, supra,* 766 F.2d at 280 (*citing Rucker v. Higher Educational Aids Board,* 669 F.2d 1179, 1182 (7th Cir.1982)). See also *Whatley v. Metropolitan Atlanta Transit Authority,* 632 F.2d 1325, 1328 (5th Cir. 1980).[3]

---

**3.** This manner of stating the requirements for Plaintiff's *prima facie* case, though stated by the Seventh Circuit as proper, does not particularly resemble the *McDonnell Douglas prima facie* case. Further, the third element—which requires the Plaintiff to show causation—suggests the need for *direct evidence* of the motives of the employer. A strict application of these requirements would therefore appear to obviate the purposes of the indirect method of proof allowed under *McDonnell Douglas* under which discriminatory motivation is initially inferred from the fact that an equally qualified member of a protected class was discharged or not hired. It is the Court's view that such direct evidence of causation should not be required at this initial stage. What should be required is some objective facts from which a Court can initially infer a retaliatory motive.

A case frequently cited by the Seventh Circuit, *Hochstadt v. Worcester Foundation for Experimental Biology,* 425 F.Supp. 318 (D.Mass.), *aff'd* 545 F.2d 222 (1st Cir.1976), addresses this precise issue, *i.e.,* what showing is required in order for a Title VII plaintiff to make out a *prima facie* case of retaliation. In attempting to adapt the *McDonnell-Douglas* approach to retaliation cases, the Court held that:

Following the teaching of *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 802, 93 S.Ct. 1817, where the Supreme Court articulated the concept of a shifting burden of proof in the context of a refusal-to-rehire case, the court concludes that in the case of an alleged retaliatory discharge the order and allocation of proof should be as follows. The employee must make out a prima facie case by showing (1) that she engaged in protected activity, i.e., she opposed unlawful employment practices or participated in Title VII proceedings, (2) that her employer was aware of the protected activities, (3) that she was subsequently discharged, and (absent other evidence tending to establish a retaliatory motivation) (4) that her discharge followed her protected activities within such period of time that the court can infer retaliatory motivation.

The *Hochstadt* formulation thus permits a plaintiff to initially show the causal link between the protected activity and the employer action through the employer's awareness of the protected activity coupled with proximity in time. The Court believes that this formulation comports with the indirect method of proof allowed under *McDonnell-Douglas* as it does not require direct evidence of employer motive at the *prima*

While a retaliation claim generally follows the *McDonnell-Douglas* analysis, after a trial has been held there is no need to determine whether the plaintiff has made out a *prima facie* case. *Suson v. Zenith Radio Corp.*, 763 F.2d 304, 307 (7th Cir. 1985). "If the Defendant fails to persuade the fact-finder to dismiss the action for lack of a *prima facie* case at the close of the plaintiff's evidence, and if the defendant goes forward and offers evidence of the reason for the plaintiff's dismissal, the fact-finder must decide the ultimate question of discrimination vel non." *McCluney v. Jos. Schlitz Brewing Co.*, 728 F.2d 924, 926 (7th Cir.1984) *(citing United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)). As stated in *Aikens*, this inquiry essentially involves "which party's explanation of the employer's motivation [the Court] believes." *Aikens*, 460 U.S. at 715, 103 S.Ct. at 1482.

The Court thus turns to the second and third steps of the *McDonnell-Douglas/Burdine* approach, which provide a formulaic method for ascertaining the employer's motivation. Under this approach, successfully establishing a *prima facie* case gives rise to a rebuttable presumption of discrimination (or, in this case, retaliation). *McDonnell-Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. To rebut the presumption of retaliation, the defendant must articulate a legitimate, non-retaliatory reason for its action. *Id.*

It should be emphasized that the Defendant's burden in presenting a legitimate, non-retaliatory reason for its actions is *only a burden of production;* the burden of persuasion rests at all times with the plaintiff. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254–55, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); *Johnson v. University of Wisconsin-Mil-*

*waukee*, 783 F.2d 59, 63 (7th Cir.1986). As explained in *Burdine*, "[i]t is sufficient that the defendant's evidence raises a genuine issue of material fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must set forth, through the introduction of admissible evidence, the reasons for [the allegedly retaliatory action]. If the defendant carries this burden of production, the presumption raised by the *prima facie* case is rebutted, and the factual inquiry proceeds to a new level of specificity [i.e., determining whether the employer's explanation is mere pretext]." *Id.*

If the Defendant rebuts the presumption of retaliation by articulating legitimate, non-discriminatory reasons for its actions, the Plaintiff "must have the opportunity to demonstrate that the proper reason was not the true reason for the employment decision ... by persuading the court that a [retaliatory] reason more likely motivated the employer or ... by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S.Ct. at 1095.

Evidence of pretext is that "other evidence" of the employer's retaliatory motivation. Such other evidence can include, for example, an employer's disciplining protesting employees differently than nonprotesting employees who engage in similar kinds of misconduct, *see e.g.*, *Simmons v. Camden County Board of Education*, 757 F.2d 1187 (11th Cir.1985) (infractions for which plaintiffs were discharged were dealt with more severely than were comparable infractions of other faculty members), responding to an employment situation in a way different from ordinary policy, *see e.g.*, *Unger v. Consolidated Foods Corp.*, 657 F.2d 909, 26 F.E.P. 1025 (7th Cir.1981), *vacated and remanded on other grounds,*

*facie* case stage; and further, that the formulation is consistent with the law in this circuit.

Under the facts of our case, Plaintiff's *prima facie* case was met. Plaintiff's evidence established that (1) Ms. Volk engaged in protected activity (through her opposition to the alleged sex discrimination); (2) the DCFS was aware of her protest; (3) Ms. Volk was not hired or was

transferred; and (4) these actions followed her protected activity within such time that the Court can infer retaliatory motiviation. (The evidence revealed that Ms. Volk was turned down for the social worker position sometime *after* she protested alleged sexual harassment, and that she was transferred *after* similar protest (after filing her EEOC charge)).

456 U.S. 1002, 102 S.Ct. 2288, 73 L.Ed.2d 1297 (1982), or where the plaintiff is actually better qualified than the person who got the job. *See, e.g., Burdine, supra.* We now turn to the facts of this case.

### (A) *Defendant's Articulated Reasons*

#### 1. *Refusal to Hire*

■ In attempting to satisfy their burden of production, Defendants state that the central reason Ms. Volk was not hired for the position of Social Worker I is that the person eventually hired, a Mr. Martin Msseemmaa, was the best person available for the job. This articulation is supported by the evidence, and the Court cannot find that the proffered explanation is either unworthy of credence or merely a pretext for retaliatory motivation.

At trial, the process by which a social worker is hired was thoroughly explained. When the position first became available, Ms. Volk was the sole applicant. Department of Personnel rules, however, provide that in cases where less than three individuals apply for a position, the supervisor may seek additional applicants. The obvious purpose of this rule is to provide an applicant pool large enough to insure that the highest quality social worker is selected.

In this case, because only one person applied for the position, Mr. Tapen sought additional applications and then hired Ms. Eileen Fane. Subsequently, however, Ms. Fane notified the DCFS that she would not be able to accept the position. Mr. Tapen thereafter sought other applicants, and Mr. Msseemmaa was eventually selected.

It was established at trial that Ms. Volk scored higher on the Civil Service examination than Mr. Msseemmaa and that she had a number of months experience that he did not possess. However, it was also established that Mr. Msseemmaa was well qualified for the position. Mr. Msseemmaa lived in Tanzania, Africa, for thirty-three years and studied in the seminary there. He then taught at the YMCA, and was sent to the United States. In this country, Mr. Msseemmaa received a B.S. degree from George Williams College in Chicago, Illinois, graduating summa cum laude (3.85 on a 4.00 scale), and an M.P.A. degree from the University of Oklahoma. In 1976, he was the youth program director for the YMCA in Naperville, Illinois, and later moved to the Chicago YMCA before applying with the DCFS. In addition, Mr. John Henderson, the labor relations administrator for the DCFS, testified that the results of the civil examination scores are not an overriding factor in hiring the best qualified social workers. Plaintiff states that Mr. Msseemmaa was also less qualified due to his inability to speak English clearly and communicate with his co-workers and clients. Many of his co-workers testified, however, that although he had a strong accent, he was also understandable. For instance, Ms. Kanthak and Mr. Kuhn, co-workers of Mr. Msseemmaa at the Ottawa field office, stated that he was in fact a good communicator and a very intelligent man. Ms. Kanthak never received any complaints about his ability to communicate. Mr. Msseemmaa's own testimony in court supports their testimony.

From the evidence summarized above, this Court finds no reason to discredit the Defendants' explanation of their rationale for selecting Mr. Msseemmaa over Ms. Volk. In this case, Defendants have met their burden of articulating valid reasons for the employment decision in issue; Plaintiff, however, has not met her burden of persuading this Court that such articulation is mere pretext for a retaliatory motivation. We therefore find that the failure to hire Ms. Volk was not in retaliation for her exercise of her rights under § 704.

#### 2. *Decision to Transfer the Grant*

■ As previously noted, Ms. Volk also claims that she was transferred from the Ottawa to the Princeton field office of the DCFS in retaliation for her exercise of her right to protest discrimination. Defendants, however, present legitimate economic justifications for the decision to transfer the grant under which Plaintiff was working. Each Defendant—as well as other DCFS officials—testified that Ms. Volk

was transferred due to a DCFS decision that no contract worker be allowed to use DCFS office space. The reason for this decision was that the department was already paying a portion of the contract price to Covenant Counseling Services for office space. Pursuant to this decision, therefore, Covenant reassigned Plaintiff to Covenant's office facility in Princeton, Illinois. Indeed, since March of 1980, people working on grants have not been physically located in DCFS offices.

Again, Plaintiff's evidence is insufficient to show that this explanation for the transfer of the grant is mere pretext, or that the explanation is otherwise unworthy of credence. Although the transfer of the grant occurred soon after Ms. Volk was turned down for the social worker position—after which she stated her intentions to file an EEOC charge—this alone does not establish that she was transferred for retaliatory reasons. In this Court's view, the chronological sequence of events, while important, is clearly not a definitive factor in determining whether or not it can be inferred that a retaliatory motivation guided an employer's actions. Here, the sequence of events, standing alone, supports Plaintiff's position. Defendants, however, have articulated legitimate economic reasons for the transfer of the grant, which Plaintiff has not rebutted by a preponderance of the evidence.

The Court, therefore, finds in favor of the Defendants and against the Plaintiff on her retaliation charge under § 704 of the Civil Rights Act of 1964.

### III. *Sex Discrimination*

■ Plaintiff finally contends that she was discriminated against on the basis of her sex in violation of Title VII when she was not hired for the social worker's position and when the grant was transferred from Ottawa to Princeton. As with the retaliation charge, application of the *McDonnell-Douglas* analysis is an appropriate method of proving class-based discrimination. Similarly, after trial, there is no need to determine whether the Plaintiff has made out a *prima facie* case. *Aikens,*

*supra,* 460 U.S. at 714–15, 103 S.Ct. at 1481–82. Thus, the Court will proceed to the question of discrimination vel non— that is, whether the DCFS intentionally discriminated against Ms. Volk on the basis of her sex. *McCluney v. Jos. Schlitz Brewing Co.,* 728 F.2d 924, 926 (7th Cir. 1984). After a trial, this involves a decision as to which party's explanation of the employer's motivation the Court will believe. *Id.*

As with Plaintiff's retaliation charge, the DCFS has articulated legitimate nondiscriminatory reasons for its employment decisions. The Court finds no reason to disbelieve these reasons or to otherwise believe that these explanations are unworthy of credence. *Ergo,* the Court finds in favor of the Defendants and against the Plaintiff on her sex discrimination charge.

### Conclusion

In accordance with the foregoing, the Court finds in favor of the Defendants and against the Plaintiff on all counts of the complaint brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*